Danna **MOTTS**, Individually and as Personal Representative of the Estate of Neville Motts, Plaintiff,

v.

**M/V GREEN WAVE**, Its Engine, Tackle, in rem, and it's Owner and Operator, **Central Gulf Lines, Inc.**, et al, Defendant.

No. Civ.A. G–98–127.

United States District Court,
S.D. Texas,
Galveston Division.

May 24, 1999.

Ronald L White, Brown Sims Wise & White, Houston, TX, for Ron White, mediator.

Richard Lee Melancon, Melancon and Hogue, Friendswood, TX, for Neville Motts, Danna Motts, plaintiffs.

Robert L Klawetter, Eastham Watson Dale & Forney, Houston, TX, for Central Gulf Lines, Inc., LMS Shipmanagement, Inc., defendants.

### FINDINGS OF FACT AND CONCLUSION OF LAW

KENT, District Judge.

The above cause came on for a non-jury trial commencing February 22, 1999, and concluding February 24, 1999, before the Honorable Samuel B. Kent, presiding. The Court having carefully considered the testimony of all witnesses presented live and by deposition; all exhibits admitted during the course of the trial; all pleadings filed in the case; Joint Pretrial Order; statements and arguments of counsel, the

Proposed Findings of Fact and Conclusions of Law, and Final Judgement submitted by Plaintiff and Defendants, and the Trial Briefs submitted in support thereof, hereby enters on the basis of the preponderance of the evidence, and applicable law, these Findings of Fact and Conclusions of law pursuant to Federal Rule of Civil Procedure 52(a):

## I. NATURE OF THE CASE

1. This is a wrongful death and survival action filed originally by Neville Motts, but was latter assumed by Danna Motts ("Mrs.Motts"), the surviving widow and Representative of the Estate of Neville Motts, ("Mrs.Motts"), the Chief Engineer of the M/V GREEN WAVE, for the alleged negligence of Defendants Central Gulf Lines, Inc. ("CGL"), LMS Ship Management, Inc. ("LMS"), and the unseaworthiness of the M/V GREEN WAVE. Mrs. Motts alleged that as a result of CGL's negligence and the unseaworthiness of the M/V GREEN WAVE, Neville Motts sustained a fractured hip and pelvis during emergency repairs to an exploded engine cylinder on February 15, 1998, and that thereafter as a result of CGL's negligence and LMS' negligence and gross negligence in denial of medical evacuation, Neville Motts' injuries were fatally exacerbated, consummating in his death on March 20, 1998, in Houston, Texas. Although denying any negligence on the part of Neville Motts leading to his injuries on February 15, 1998, Mrs. Motts also asserted that Defendants' negligence in failing to timely obtain appropriate medical care superseded any negligence on Neville Mott's part and was a proximate cause of his death.

2. Defendant denied Plaintiff's allegations and contended that Texas law should not be applied to Plaintiff's claims against LMS. Further, Defendants contended that the explosion was due to negligence of Neville Motts and that any injuries sustained by Neville Motts were as a result of his own negligence. Defendants also alleged that the negligence of Neville Motts' health care providers in Houston, Texas, was a superseding cause of his death.

## II. STIPULATIONS AND JURISDICTIONAL FINDINGS OF THE COURT

1. The parties stipulated and the Court finds that from February 15, 1998, through March 20, 1998, the crew and officers of the M/V GREEN WAVE, including Neville Motts, were in the employ of CGL.

2. The parties stipulated and the Court finds that from February 15, 1998, through March 20, 1998, CGL was the owner of the M/V GREEN WAVE, and LMS contracted to manage and maintain the M/V GREEN WAVE for CGL.

3. The Court finds this matter is properly brought within its admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1331 et seq. The Court also finds that it has jurisdiction over all the parties and that proper venue for this suit is in this District and before this Court. Neither jurisdiction nor venue was contested.

## III. FINDINGS OF FACT

### A. Summary of Proceedings and Claims Asserted

1. Neville Motts commenced this suit on March 9, 1998, against his employer, CGL, alleging negligence under the Jones Act, 46 U.S.C.App. § 688, and the unseaworthiness of the M/V GREEN WAVE under the general maritime law as causes of the injuries he sustained on February 15, 1998. Mr. Motts sustained a fractured hip and pelvis on February 15, 1998, but rather than being evacuated he was kept aboard the vessel for over two (2) weeks. During most of this time M/V GREEN WAVE was under tow to Lyttleton, New Zealand, by the helicopter-equipped U.S. Coast Guard vessel POLAR STAR. Mr. Motts was examined at a hospital in New Zealand and then flown to Houston, Texas, for treatment. Mr. Motts had surgery on March 10, 1998, and he died in Houston, Texas, on March 20, 1998.

2. After Neville Motts' death, Mrs. Motts substituted as Plaintiff and amended the Complaint to assert claims against

LMS. Mrs. Motts alleged wrongful death and survival causes of action against CGL under the Jones Act and general maritime law, both for the negligence and unseaworthiness of M/V GREEN WAVE leading to Neville Motts' initial injury and for the fatal delay in medical attention. Mrs. Motts made claim against LMS under state law, or in the alternative, general maritime law, for the acts and omissions of LMS' personnel in New Orleans, Louisiana, in denying timely and adequate medical attention to Neville Motts and resulting in his death in Houston, Texas, on March 20, 1998.

3. Before trial, LMS filed a Motion for Partial Summary Judgment, claiming that the Death on the High Seas Act, 46 U.S.C.App. §§ 761 *et seq.* (DOHSA), applied to the exclusion of the general maritime law or state law wrongful death and survival claims asserted by Mrs. Motts against LMS. The Court determined, and now confirms based on the entire record before it, that the fatal exacerbation of Neville Motts' injuries caused by the negligence and gross negligence of LMS' officers acting solely in New Orleans, Louisiana, was consummated at the time of his death in Houston, Texas. As a result, Texas law and not DOHSA is properly applied to Mrs. Motts' claims against LMS. The Court, therefore granted LMS' motion with respect to Plaintiff's claims under the general maritime law, but denied LMS' motion with respect to Plaintiff's claims under Texas Law.

B. *Evidence Reviewed and Resulting Findings*

1. For many years now, the M/V GREEN WAVE has made an annual voyage to McMurdo Station in the Antarctic as part of "Operation Deep Freeze", the annual re-supply and logistical support effort for the research facility operated by the National Science Foundation and U.S. Antarctic Research Program. Captain Peter Stalkus has participated in Operation Deep Freeze for the last fifteen (15) years and served as the Master of the GREEN WAVE for the last fourteen (14) years. The Court finds that as of February 15, 1998, Captain Stalkus had substantial experience in serving as Master in the Antarctic and significant familiarity with the resources available and climatic conditions in the region.

2. Neville Motts joined the M/V GREEN WAVE in Port Hueneme, California, on January 10, 1998, as a replacement, or "pier-head Jump", Chief Engineer for the 1998 voyage to McMurdo. Mr. Motts graduated from the United Kingdom's Hull Maritime Academy in 1968, and was in the merchant marine in England before moving to the United States and working for Global Marine, Glenn Eagle and Keystone as an engine superintendent and chief engineer. All told, Mr. Motts had approximately thirty (30) years seagoing and engineering experience which specifically included work on medium speed engines such as the one found on the M/V GREEN WAVE. Accordingly, the Court finds that as of January 10, 1998, Mr. Motts had substantial experience working in the capacity of chief engineer aboard vessels like the M/V GREEN WAVE, although he had no prior experience aboard that particular vessel and was unfamiliar with many of its procedures and practices.

3. The M/V GREEN WAVE departed from Port Hueneme on January 12, 1998, and arrived in Lyttleton, New Zealand, on January 29, 1998. Just before arriving in Lyttleton, Mr. Motts reported that the No. 7 fuel pump was not lifting and the fuel cam was found lose on the camshaft. Mr. Motts personally repaired the No. 7 fuel cam while the ship was in New Zealand and reported that the repair job was done and "went fine".

4. On February 15, 1998, at approximately 0623 hours, the vessel experienced engine failure when the No. 2 piston seized in its liner and pieces of the liner shot through the crankcase door. At that time, the vessel was on its return voyage from McMurdo in the Ross Sea off Antarctica and its location was at approximately 71

degrees south, 400 miles north of McMurdo Station and 1700 miles from New Zealand. Just prior to the engine failure, Mr. Motts reported that "No. 7 seen not firing, then begins firing again". Defendant's marine expert, Mr. Dean Harrison, conceded that the engine's lube oil had been contaminated from the commencement of the voyage. Plaintiff's retained marine engineering expert emphatically testified that the vessel's engine broke down because of faulty maintenance of long standing. In August, 1996, the engine's manufacturer recommended replacement of the cylinder liner. This was never done. The back flush filtration unit had been malfunctioning since November, 1997, creating lube oil contamination problems for months. The engine had fuel injector problems and a "rough" cycle for months and bad timing. Simply put, the engine was a mess.

5. The ship had just cleared a 90–mile band of heavy iceberg concentration and the piston seizure rendered the vessel dead in the water and drifting at the same rate and in the same direction as the icebergs in the vicinity. As a result, there was no acute danger to the vessel from the drifting ice. About an hour after the seizure, Captain Stalkus and Mr. Motts met to discuss the resulting damage and course of action. It was decided that the No. 2 unit would be disassembled and refitted with a spare liner. Mr. Motts was directed to "utilize all due caution and rotate personnel to prevent fatigue-related mishaps", but Mr. Motts was given no further guidance despite his newness to the vessel's crew. The Captain also instructed Mr. Motts to utilize deck department personnel to assist with the rigging and securing of the head, piston and liner, if required. The Captain took the Chief Mate off watch and told Mr. Motts that the Chief Mate, along with other deck department crewmembers, would be available to assist him if and when called. However, James Nowlin, the vessel's former first assistant engineer, testified that he left the vessel due to extreme safety concerns and that the proper tools to do the repair were *not* aboard the vessel.

6. At approximately 1435 hours, Mr. Motts, assisted by the second and third assistant engineers, pulled the No. 2 cylinder head using a hoisting device called a chainfall. The chainfall was connected to an overhead rail which allowed them to move the 3000 pound cylinder head to a headstand. The headstand is essentially a flat table which sits over an adjacent cylinder head with the stand's hollow legs fitting over studs that protrude up from the adjacent cylinder head. It is undisputed that Mr. Motts failed to secure the headstand before placing the cylinder head on it and failed to lash down the cylinder head before releasing the chain fall, as he apparently assumed its sheer weight would keep it stationary. While the preferable procedure, in hindsight, would have been to secure the head, the procedure he used was an acceptable one. Plaintiff's expert, Captain Richard D. Stewart, testified that the Captain should have supervised Mr. Motts while he made the repair, despite Mr. Motts' experience, because of his extreme newness to the vessel and the extensive nature of the proposed repairs. The second and third assistant engineers stated that immediately after the chainfall was released but before the head could be lashed down, the ship took a large roll and the head slid off the headstand. Given the weather conditions, the Court finds such unforeseeable. The head hit Mr. Motts on his left side knocking him down and pinning him between the head and the upper engine platform rail. The second and third assistant engineers then assisted Mr. Motts out from behind the head.

7. As a result, Mr. Motts suffered a crushed pelvis and hip when he was struck by the massive cylinder head and pinned against the stated rail on M/V GREEN WAVE. The Captain and the Chief Mate, the ship's designated medical officer, were immediately called to the engine room. Both the Captain and the Chief Mate physically assessed Mr. Motts to deter-

mine the nature of his injuries. Mr. Motts had a cut on his leg, but did not then appear to have any broken bones. However, he was dazed, in pain and had difficulty moving. He was immobilized and moved by Stokes litter from the engine room to his cabin. At that point, the Captain and Chief Mate rendered first aid to Mr. Motts and went through a total medical assessment of Motts in preparation for contacting the Emergency Department's Maritime Medical Access Unit at George Washington University Hospital (hereinafter "GWU"). The Maritime Medical Access Unit is a service whereby emergency room physicians at GWU provide emergency medical advice to ships at sea with medical problems. Ship owners, including CGL, rely on this type of medical service to provide medical advice for injured or ill seamen, including the type of treatment the patient needs and how quickly the patient needs to receive the treatment. The U.S. Coast Guard also relies on this type of service for medical assistance and the Court finds it is reasonable to follow the service's advice.

8. Within one and one-half hours of Mr. Motts' injury, Capt. Stalkus contacted GWU and discussed his injury with Dr. Yolanda Haywood, a board certified emergency physician. Mr. Motts' vital signs were related to Dr. Haywood and it was noted that Mr. Motts seemed neurologically intact and had not suffered a loss of consciousness. It was noted that he had sustained a 3–inch laceration on his left thigh which was cleaned and dressed; and abrasions of his left lower calf; and a contusion to his left big toe. While there was then no evidence of shortening or external rotation of the left leg and there was no hip pain with rotation of the left leg, it was noted that Mr. Motts "hobbled" immediately after the injury, and appeared to be in considerable pain. Dr. Haywood made an initial differential diagnosis of soft tissue injury vs. fracture and recommended wound care, Tylenol 3 as need for pain and Motrin. However, she also recommended an x-ray *as soon as possible,* to rule out more severe injury. (Emphasis

added.) Captain Stalkus told Dr. Haywood that it would be 8–9 days before the vessel reached New Zealand, and in the absence of x-ray analysis, Dr. Haywood did not consider Mr. Motts' condition life threatening and did not then recommend immediate evacuation.

9. Defendant LMS is a Louisiana corporation that is the management company for CGL. LMS provides a number of services to CGL and its vessels, including employment of a Director of Personnel and Marine Healthcare Coordinator to ensure adequate and timely medical attention to injured or ill seamen on CGL's vessels. Defendant LMS had no employees of its own aboard the M/V GREEN WAVE from the time of Neville Motts' initial injury and until he was finally taken off the vessel several weeks later in New Zealand. For several years before this voyage, LMS had contracted to manage and maintain M/V GREEN WAVE as agent for CGL. The ship's officers reported the injury to LMS and informed LMS' officers in New Orleans that Neville Motts' medical condition was subject to potential complication because of a history of vascular problems and cardiovascular surgeries. However, no immediate action was taken by LMS or CGL to attempt to evacuate Neville Motts to appropriate medical care. Instead, Motts was placed upon a mattress in his ship's office, where he remained for over two (2) weeks. He received no medical attention other than Tylenol with codeine.

10. M/V GREEN WAVE remained adrift for two (2) days on the high seas because of the vessel's continuing engine problems. The crew of the M/V GREEN WAVE continued with the engine repair and the vessel was under power again at approximately 0136 hours on February 17, 1998. The Captain testified that due to the prevailing conditions, and the fact that the engine was only operating on seven cylinders, the safest course of action was to continue to proceed north to New Zealand rather than to attempt to return to McMurdo, Antarctica. At approximately

1312 hours on February 17, the main engine's vulkan coupling ruptured and rendered the vessel again dead in the water approximately 500 miles north of McMurdo.

11. The M/V GREEN WAVE eventually requested and received assistance from a helicopter-equipped Coast Guard cutter POLAR STAR, on that same day, February 17, 1998. The POLAR STAR arrived at the GREEN WAVE's position at approximately 1008 hours on February 18, 1998, and proceeded to tow the GREEN WAVE to Christchurch, New Zealand. Incredibly, while Captain Peter Stalkus and Chief Mate Christopher Murray suspected by now that Mr. Motts had sustained a serious fracture, although Captain Stalkus claimed to be unable to determine whether or not it was a life-threatening injury, *no* mention of this was made to the attending POLAR STAR. In New Orleans, the LMS Director of Marine Personnel, Captain Ewers, also suspected Mr. Motts may have suffered an injury that might lead to an embolism, but the vessel was not instructed to take more active measures in Mr. Motts' behalf.

12. The M/V GREEN WAVE stayed in contact with GWU and kept them apprised of Motts' condition. GWU was also advised that the M/V GREEN WAVE would not reach port until February 28 or March 1. Mr. Motts was still in great pain and unable to bear weight on his leg, but he was able to ambulate with substantial assistance. Based on the suspicion that Mr. Motts had suffered a fracture, the emergency room doctors at GWU recommended that he have x-rays "as soon as feasible", restrict activity, apply heat to the area of the injury and continue the treatment with medications. Captain Stalkus testified that he discussed a helicopter evacuation of Neville Motts with LMS' officers, but inexplicably neither CGL nor LMS informed the United States Coast Guard personnel alongside M/V GREEN WAVE or in New Orleans that Neville Motts required immediate medical assistance. Although the POLAR STAR was equipped with an x-ray machine and trained medical

personnel, the United States Coast Guard was not told the George Washington University's maritime Medical Service personnel, consulted by satellite telephone by M/V GREEN WAVE, had specifically advised that Mr. Motts required an x-ray of his leg as soon as possible. The Court finds such omissions to be remarkably negligent.

13. Instead, the Coast Guard personnel aboard POLAR STAR were told, as reflected in the official logs, that the Chief Engineer had suffered a "minor injury"! The Court noted the testimony of Captain Timothy McKinna, an experienced former Coast Guard officer, that these logs are as accurate a document as can be obtained off a United States Coast Guard vessel.

14. The Court finds the Coast Guard logs made at or near the time of the occurrences that form the basis of this action are persuasive as to the communications made to the United States Coast Guard about Neville Motts and his condition. Based on the POLAR STAR logs, the Court finds that the Coast Guard vessel alongside the M/V GREEN WAVE was told, in direct contradiction to the awareness of both CGL and LMS' personnel, and the suspicion of both the Captain and the Chief Mate, that Neville Motts had likely *not* sustained serious injuries requiring prompt medical attention, but rather that he had only suffered a minor injury and that no medical assistance was necessary. In this regard, although Captain Stalkus initially denied in his sworn testimony that the Coast Guard was told Neville Motts had only suffered a minor injury, after being specifically advised of the penalties of perjury, Captain Stalkus testified that he could not recall whether such a report was made. As a result, Defendants did not produce any evidence to contradict the accuracy of the official Coast Guard records. Again, the Court finds such conduct to be utterly negligent and downright inhumane.

15. Mr. Motts was confined to his quarters and a mattress on the floor of his

ship's office, except for periods when he went to the bathroom with substantial assistance or tried to do paperwork. M/V GREEN WAVE remained under tow by the Coast Guard for almost two weeks before reaching New Zealand. During that time, LMS' officers in New Orleans continued to communicate with M/V GREEN WAVE about Mr. Motts' condition. However, Neville Motts did not receive any medical attention until the vessel reached New Zealand, on March 1, 1998. From there, at his own request, he was evacuated to Houston, where he underwent hip surgery on March 10, 1998. On March 20, 1998, Neville Motts died in Houston, Texas, as a result of causes more fully discussed below.

16. The Court finds that the engine failure offshore Antarctica on February 15, 1998, was proximately caused by CGL's failure to properly repair and maintain the engines of M/V GREEN WAVE. In particular, the crankcase explosion resulted from the combination of CGL's failure to replace the No. 2 cylinder lining as recommended over eighteen (18) months earlier and a nonfunctioning backflush lubrication filtration system, which resulted in contaminated lube oil. The Court further finds CGL was negligent in sending M/V GREEN WAVE and its crew on this voyage, despite its actual knowledge of the likelihood of a crippling engine failure in highly remote and inherently dangerous waters, and that repair at sea of such a massive part was inherently hazardous and therefore unreasonably dangerous to the crew.

17. CGL, through its agents at LMS, was specifically advised of the need to replace the No. 2 cylinder lining long before the vessel left for Antarctica on this voyage in January, 1998. John Hodges, the LMS Port Engineer for M/V GREEN WAVE, was aware of the August, 1996 findings of the field engineer from MaK, the engine' manufacturer, that the No. 2 cylinder lining needed to be replaced. CGL actually ordered a replacement within a few months of the August, 1996 drydocking, but did not effect a repair at any time before the vessel left for Antarctica in

January, 1998. Such a course constitutes both negligence and unseaworthiness.

18. Seasoned mariners testifying before the Court felt it would not have been reasonable to put to sea knowing there was a recommendation to change the cylinder liner. Franklin F. Ewers, Jr., Director of Marine personnel for LMS, is an experienced master with thirty-three (33) years of seagoing experience. Captain Ewers testified he did not think it would be prudent to depart on a voyage if he had received a recommendation that a cylinder head needed replacement because the engine would be incapable of performing its function. Similarly, Chief Mate Chris Murray of M/V GREEN WAVE testified that it would not be prudent for a ship's Master to proceed to sea if he was aware that a cylinder head was in danger of failure and might require major repairs at sea. Chief Mate Murray further testified the ship may be considered unseaworthy in such a situation. Marine engineer Jay Webster, a retained expert for Plaintiff, testified that changing a cylinder head is a very difficult operation at sea, and Mr. Webster tendered his opinion that Neville Motts made every effort to do a safe job under difficult circumstances. It was also Mr. Webster's opinion that the fact that the backflush filtration system was nonfunctional made the vessel unseaworthy.

19. Chief Engineer Neville Motts joined the vessel as a "pier head jump" for this voyage. First Assistant Engineer James Nolan testified Neville Motts came aboard M/V GREEN WAVE for the first time in Port Hueneme approximately eighteen (18) hours before the vessel departed for this Antarctic voyage. Captain Richard Stewart, a retained expert for Plaintiff, is a graduate and faculty member at the U.S. Merchant Marine Academy, a licensed Master, and former department head for the Marine Transportation Department. Captain Stewart defined a "pier head jump" as a person that the vessel's Captain would not be familiar with, in terms of his working policies. Cap-

tain Stewart testified that for a "pier head jump," the Captain should have taken extra effort to see that his work was carried out the way the Captain wanted the job carried out, including, if necessary, assigning someone to observe the work of the "pier head jump". As the vessel was dead in the water, there were an abundance of personnel to assign this task.

20. Captain Stewart also testified that, based on his review of the injury manual of LMS, it was his opinion that LMS had a duty to provide the best possible care on a priority basis for injured or ill seamen aboard CGL vessels, and LMS utterly failed in this duty. Captain Stewart criticized the failure to include any procedures for emergency evacuation in remote areas or a policy for discussing possible medical problems with next of kin. Captain Stewart's opinion was that LMS had completely failed to take necessary steps to deal with evacuation and serious injuries of personnel in remote locations. Captain Stewart found no contingency plans for emergency evacuation or grave illness or accidents. Captain Stewart was of the opinion that, considering the remote locations in which CGL's vessels operated and the potential difficulty in evacuating injured or ill crewman, LMS should have had clearly outlined programs to deal with this type of situation. Captain Stewart also testified that upper management at LMS needed to see that such policies were followed, adhered to and properly carried out. The Court finds its failure to do so was negligence.

21. Captain Stewart testified that these omissions by LMS' corporate officers involved an extreme degree of risk considering the probability and magnitude of potential harm to an injured or ill seaman. Finally, Captain Stewart opined, under the circumstances, that LMS'S management had actual subjective awareness of the risk involved, because they had been trading in this remote area for years and were aware of the difficulties, but nevertheless proceeded with conscious indifference to the rights and safety or welfare of injured

seamen on GCL's vessels, and in particular Neville Motts.

22. Mr. Jay Webster, an expert marine engineer for Plaintiff, testified that Neville Motts had used good engineering practices and seamanship in the systematic repair of the problems that he found on the vessel. First Assistant Engineer James Nolan, likewise, described Neville Motts as one of the best Chief Engineers he had sailed with. The Court finds, based upon the totality of the evidence, that Mr. Motts was not contributorily negligent as regards the manner of his repairs or the injuries he sustained while engaged therein.

23. After being qualified without objection by this Court as an expert witness pursuant to Rule 702, Marine Chief Engineer Jay Webster testified he reviewed the engine log's from the GREEN WAVE, the workbook and MaK reports and invoices. Mr. Webster pointed out that his review of the engine log reports confirm the findings of the MaK field engineer that the lubrication oil filtration system had been inoperable for many months, creating a dangerous buildup of carbon and other impurities in the system. When combined with the heat build up resulting from the defective No. 2 cylinder lining, the engine seized at the bottom of its travel. Mr. Webster identified the explosion site as the area the MaK representative identified in 1996 as the reason the cylinder liner needed to be replaced. Mr. Webster opined that the ineffective and unrepaired filtration system and the defective cylinder lining rendered the vessel unseaworthy, and should have been repaired by an effective maintenance program. Defensive experts hotly contest this position, but the Court finds such testimony unpersuasive.

24. First Assistant Engineer James Nolan testified that he had made reports to CGL management about safety concerns with the M/V GREEN WAVE approximately six (6) months before this voyage, and he refused to sail on the M/V GREEN WAVE for a time because they were ignored. Mr. Nolan also testified

that the findings of the MaK field engineer as to the cause of the failure, which were admitted into evidence as Plaintiff's Exhibit No. 4, were reasonable and consistent with his own conclusions based upon his experience and work as permanent First Assistant Engineer on the M/V GREEN WAVE. Mr. Nolan was also able to offer testimony describing the profound extent of Mr. Motts' pain. Finally, Mr. Nolan testified that Captain Stalkus found the weather the best he had seen in fourteen (14) years.

25. Mr. Webster also testified the No. 7 cam repair had nothing to do with the explosion in the No. 2 cylinder. Mr. Webster stated this was evident because in the MaK report they ended up having to overhaul several of the cylinders, but No. 7 suffered no damage.

26. The Court finds that the injury was very serious and Captain Stalkus, Central Gulf Lines and LMS Ship Management were aware of the severity of the injury, yet failed to render timely care. Captain Ewers even testified that he knew the type of injury Neville Motts had could lead to death.

27. The Court finds that, for whatever reason, neither Captain Stalkus nor Chief Mate Murray was able to appreciate the necessity of evacuating Mr. Motts. As a result, the Court finds that the Master and Chief Mate were not competent to evaluate and determine appropriate medical care for a crewmember, and this incompetence was negligent and/or rendered M/V GREEN WAVE unseaworthy.

28. Captain Timothy George McKinna was also called to testify. Captain McKinna, a graduate of the U.S. Coast Guard Academy, a retired U.S. Coast Guard Captain, former Coast Guard Liaison to Naval Support Force Antarctica, and former ship's operations officer, testified part of his function was to coordinate with air traffic the movement of cargo on and off McMurdo. Captain McKinna was accepted by this Court as an expert in logistics in Antarctica.

29. Captain McKinna was of the opinion that it was feasible and appropriate to evacuate Mr. Motts to McMurdo Bay.

30. Captain McKinna testified and the Court finds that it was negligence for Captain Stalkus of the M/V GREEN WAVE to fail to inquire about the resources of the U.S. Coast Guard and of McMurdo Bay's resources.

31. The evidence confirms that U.S. Coast Guard POLAR STAR was equipped with an x-ray machine, nurse practitioner and medical corpsman. The POLAR STAR was also equipped with helicopters available to evacuate Neville Motts to McMurdo Bay for transfer to New Zealand. Plaintiff's expert, Captain Taylor, former Master of POLAR STAR, reviewed the communications between the GREEN WAVE, CGL, LMS, and the POLAR STAR. Captain Taylor opined that M/V GREEN WAVE, CGL, and LMS never gave the Coast Guard the opportunity to weigh that decision to evacuate. Taking all these issues into account, including the contradicting testimony of Defendant's expert, Captain Cartner, the Court finds on balance that evacuation was feasible and should have been accomplished. The Court finds that the failure to do so was negligence.

32. Captain Stewart surveyed the documents and depositions and did not see any communication from LMS to George Washington about the possibility of evacuating Mr. Motts. Captain Stewart did not see that LMS ever informed George Washington that the GREEN WAVE was being towed by a Coast Guard vessel that might have substantial medical facilities aboard. Captain Stewart was of the opinion that such omissions fell below what a reasonably prudent shipping company would do given the circumstances. The Court finds LMS was negligent in failing to inform George Washington Maritime Medical Service of the fact that the vessel was being towed by a Coast Guard vessel that had substantial medical services aboard.

33. The Court also finds that the M/V GREEN WAVE provided false and misleading information to the U.S. Coast Guard on at least two (2) occasions and, as a foreseeable result, the Coast Guard did not render assistance. The Court finds that providing false and misleading information to the U.S. Coast Guard is a violation of the law and was in this instance a proximate cause of the death of Neville Motts.

34. Mr. John Cartner, a retained expert for the defense on maritime operations, testified that the medical facilities aboard the M/V GREEN WAVE were equivalent to those aboard the POLAR STAR, with a physician's assistant, medical corpsman and x-ray machine. The Court finds this testimony so wholly unsupported by the Record as to be asinine on its face.

35. The Court also finds that LMS' officers charged with the duty of protecting seaman aboard the vessel never contacted the Coast Guard regarding evacuation of Neville Motts.

36. Captain Stalkus also failed to act as a reasonably prudent mariner would have acted by failing to seek all possible options to evacuate Neville Motts, including determining the capabilities of the USCG POLAR STAR, and was therefore negligent.

37. The Court also considered the testimony of Dr. Zoran Cupic, a board-certified surgeon retained by Plaintiff. Dr. Cupic testified that Neville Motts had a fracture of the head of the femur and a fracture of the acetabulum that allowed the hip to dislocate out of the joint. Dr. Cupic testified that there is absolutely no way anyone could describe this as a minor injury and that it is a profoundly painful injury. It was Dr. Cupic's opinion that a patient with that type of injury would have one to two units of blood loss within a day or so and might lose more. Like wise, Dr. Jeffrey Reuben, the doctor who actually performed the surgery on Neville Motts and who has completed over 2,000 hip surgeries, testified that Neville Motts' injury was one of the most severe fracture dislocations he had had the obligation to treat in his practice.

38. Dr. Cupic further testified that, assuming the POLAR STAR arrived on February 17, 1998, equipped with two helicopters, a certified nurse practitioner and a medical corpsman, the proper thing to do, considering what the Captain of the M/V GREEN WAVE had been told by the physicians at MMS, was to get him an x-ray immediately after they were told to do get an x-ray by MMS. Both Dr. Weiner, Defendants' expert orthopedic surgeon, and Dr. Michael Rothkopf, Defendants' expert cardiologist, testified that the delay of three (3) weeks from the time of the injury until Mr. Motts had surgery had no impact whatsoever on Mr. Motts' survival. The Court does not find such testimony credible.

39. Dr. Cupic explained that the risks of prolonging the surgery were many. Mr. Motts had already been lying down. He had been in enormous pain. He had lost blood. He had lost fluids. He had probably by this time developed deep vein thrombosis, the precursor to a pulmonary embolism. Considering all the evidence, the Court finds that Mr. Motts sustained severe pain, and further finds that Mr. Motts should have been evacuated immediately for x-rays as the MMS doctors had recommended.

40. The Court also noted that Dr. Weiner testified based on the assumption that Mr. Motts was a large man, 250 to 300 pounds, whereas his wife of twenty (20) years, Mrs. Danna Motts, confirmed that her husband at the time of his death weighed only 145 pounds.

41. Dr. Cupic testified that any surgery of the hip—of a fractured hip, and one especially the kind that Mr. Motts had—should be done within forty-eight (48) hours. The risk of death and complications are at least double if not triple if surgery is postponed more than two days. The risks include both pulmonary embolism and cardiac problems because of the stress of the pain. It is also ten (10) times

more difficult to do the surgery three (3) weeks later than it is to do it within a day or two. Dr. Cupic testified that his opinions were supported by the medical literature as well as his own vast clinical experiences in orthopedic surgery.

42. The Court believes there is no way to tell the exact cause of death because an autopsy was not done. However, the Court finds, based upon all the medical evidence, that there was a greater risk to Mr. Motts of suffering myocardial infarction or pulmonary embolism because of the tremendous and inexcusable delay in providing him surgery. The Court notes that Mr. Motts had had a history of prior medical problems, including vascular problems and related surgeries, but finds that none of such in reasonable medical probability contributed to causing his injury or subsequent death in any way.

43. The Court finds, based upon all the medical testimony, that within reasonable medical probability the delay in securing medical treatment for Mr. Motts was the proximate cause of his death in Houston on March 20, 1998. Part of this delay was due to Mr. Motts' desire to be treated in the United States, But, all of the doctors agreed this was normal and the Court finds no fault in Mr. Motts' request.

44. With respect to Defendant's suggestion that Mr. Motts' care in Houston led to his death, the Court finds and concludes that there was no such superseding cause of Mr. Motts' death.

45. Mrs. Motts testified as to the nature of her relationship with Neville Motts and the impact of this incident on her life. Mrs. Motts is no longer employed due to pre-existing diabetes, high blood pressure, and related medical problems. Mrs. Motts testified that they had planned for Neville Motts to work until he was able to vest in his Union's health and pension plan. With the loss of her husband, Mrs. Motts has no family support. Mrs. Motts testified the funeral expenses were approximately $12,000.00, and the Court so finds.

46. The Court recognized Dr. Ken McCoin, Plaintiff's economist, as an expert in evaluation of economic loss pursuant to Rule 702. The Court finds, based upon the testimony of Dr. McCoin, using the standards of Culver II and its progeny and the evidence before the Court, that Plaintiff has sustained past and future economic losses of $660,686.00, inclusive of lost wages and fringe benefits. The Plaintiff sustained $50,686.00 in past lost financial support and will sustain $600,000.00 in future economic financial support. Dr. McCoin also testified that Plaintiff has theoretically lost $7,644.00 in household services in the past and will, over the course of her lifetime, lose $60,300.00 in household services. The Court finds these excessive and rather determines that $10,000.00 is a more appropriate calculation of such losses. This would yield total losses of $660,686.00.

47. Dr. McCoin testified that Decedent had a work life expectancy of 5.1 years, to age 65. The Court recognizes that Dr. McCoin did not use the theoretical tables for how long Mr. Motts would work because he had substantial credible information to believe Mr. Motts would work in excess of the theoretical work life tables in order to enjoy the fruits of a pension and health benefits from his Union. Dr. McCoin further testified that Decedent had averaged $93,014.00 in gross wages over the six (6) years prior to the year ending in 1997, which would yield a net adjusted annual average wage of approximately $61,000 per year, deducting for Social Security payments, income taxes, a $15,000 per year deduction for personal use, and work cost of approximately $8,000.00 per year. This figure is, after some discussion, roughly the same as that opined by Defendants' economist, Dr. Yeager, who testified that Mr. Motts would have an estimated personal consumption of 45.8% or more, or about $201.00 per day. The Court finds that Defendants' retained economist, Dr. Yeager, did not properly estimate the lost pension benefits and the insurance coverage when he considered the total economic loss of Plaintiff. On balance, the Court finds

Dr. McCoin's evaluation, which comported with this Circuit's standards for evaluating pecuniary loss, more persuasive, but has selected a total damage calculation somewhat between that of the two economist experts.

### D. Damages

48. Based on the totality of evidence in this case, the Court finds and concludes that the Plaintiff has sustained the following losses by a preponderance of the evidence for which CGL, LMS, and M/V GREEN WAVE are each individually, jointly, and severally liable:

a. for the physical pain and mental anguish and suffering sustained by Neville Motts from his injuries on February 15, 1998, and through and until his death on March 20, 1998, in the amount of $225,000.00;

b. for the loss of the care, maintenance, support, services, guidance, advice, counsel and reasonable contributions of a pecuniary value that Neville Motts, deceased, would in reasonable probability, have provided Plaintiff DANNA MOTTS from the date of the incident in question up to and through the time of trial, in the amount of $50,686.00; and

c. for the loss of the care, maintenance, support, services, guidance, advice, counsel and reasonable contributions of a pecuniary value that Neville Motts, deceased, would in reasonable probability, have provided Plaintiff DANNA MOTTS in the future, in the amount of $400,000.00.

49. Based on the totality of evidence in this case, the Court finds and concludes that Plaintiff has sustained the following additional losses by a preponderance of the evidence for which LMS is liable:

a. For the just and reasonable cost of the funeral and burial expenses necessary for the internment of Neville Motts of $12,000.00;

b. For the mental anguish, emotional pain, torment and suffering that Plaintiff Danna Motts has experienced as a result of the loss of Neville Motts from the date of the incident in question up to the time of trial, in the amount of $75,000.00;

c. For the loss of companionship, society, love, nurture, and comfort that Danna Motts experienced as a result of the loss of Neville Motts from the date of the incident in question up to and through the time of trial, in the amount of $25,000.00;

d. For the mental anguish, emotional pain, torment and suffering that Plaintiff DANNA MOTTS will experience in the future as a result of the loss of NEVILLE MOTTS, in the amount of $200,000.00; and

e. For the loss of companionship, society, love, nurture, and comfort that Plaintiff DANNA MOTTS will experience in the future as a result of the loss of NEVILLE MOTTS, in the amount of $75,000.00.

50. The Court finds that in light of the conduct of LMS' officers, both in their conscious indifference to the great risk of serious injury or death to Neville Motts at the time when he was most in need of their active assistance, and as subsequently ratified by LMS' officers, exemplary damages in the amount of $250,000.00 should be and are hereby assessed against LMS. This award is specifically intended to deter similar conduct in the future under the circumstances presented by this Defendant.

51. "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, well-nigh automatic". *Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026, 1028 (5th Cir.1986). This rule applies equally to Jones Act claims brought under the court's admiralty jurisdiction. *Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 490 (5th Cir.1985). A Trial Court only has the discretion to deny prejudgment interest where the peculiar circumstances would make such an award inequitable. *Id., citing Inland Oil & Transport*, 696 F.2d at 327. In this Circuit, prejudgment interest is usually awarded to the date of loss to ensure that the injured

plaintiff is compensated for the use of funds to which the plaintiff was entitled, but which the defendant had use of prior to Judgment. *Reeled Tubing, Inc.*, 794 F.2d at 1028.

52. The Court also has broad discretion in setting the rate of prejudgment interest. *Reeled Tubing, Inc.*, 794 F.2d at 1029. In setting the rate of prejudgment interest as to past damages, the Court appropriately may look to reasonable guideposts, including the interest rates set forth in 28 U.S.C. § 1961 for judgments. *Reeled Tubing, Inc.*, 794 F.2d at 1029. The Fifth Circuit has previously approved, taking into account the equities involved, application of the rate prevailing under 28 U.S.C. § 1961 at the time the loss occurred, in this case February 15, 1998. *Id.* Taking judicial notice of the prevailing rate for February 26, 1998, which falls approximately between the initial injury and Mr. Motts' death, the Court finds the most equitable rate of prejudgment interest would be 5.407%. 28 U.S.C. § 1961. Accordingly, the Court finds and awards on all damages accrued through the entry of Judgment prejudgment interest to run at 5.407%.

53. Although pled, Plaintiff did not present any evidence in support of her claims for recovery of the unpaid medical expenses and unearned wages through the end of the voyage of the M/V GREEN WAVE, and Mrs. Motts testified that no medical bills were currently outstanding. Likewise, Plaintiff did not offer testimony as to the loss of the present value of the assets that Neville Motts, in reasonable probability, would have added to his estate and left at natural death to Plaintiff from the date of the incident in question up to the time of trial and in the future. The Court therefore DENIES Plaintiff's claims for these damages.

## IV. *CONCLUSIONS OF LAW*

54. The Court finds that this is a case of admiralty and maritime jurisdiction.

55. At the time of his injury on February 15, 1998, Neville Motts was a "seaman" as that term is legally defined under the Jones Act, employed by CGL.

56. The injuries sustained by Neville Motts on February 15, 1999, were proximately caused by the negligence of CGL and the unseaworthiness of M/V GREEN WAVE. This negligence and unseaworthiness were each and both a legal and factual cause of Neville Motts' injuries. The Court further finds no negligence attributable to Mr. Motts.

57. CGL's failure to provide timely and adequate medical care to Neville Motts after his injuries on February 15, 1998, proximately caused his ultimate death in Houston, Texas, on March 20, 1998. The Court further finds and concludes that M/V GREEN WAVE was rendered unseaworthy by the incompetence of Captain Peter Stalkus and Chief Mate Christopher Murray to evaluate and provide proper and adequate medical attention for injured or ill crewmembers. A vessel's unseaworthiness may arise from any of a number of factors, including an unfit crew. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971); *Miles v. Melrose*, 882 F.2d 976 (5th Cir.1989). This unseaworthiness was a legal and proximate cause of the death of Neville Motts.

58. The Court finds that LMS' acts of neglect and gross neglect resulting in the death of Neville Motts occurred and were exclusively consummated in Louisiana and with Neville Motts' death in Houston, Texas, on March 20, 1998, and as a result Texas law is properly applied to Plaintiff's claims against LMS. Consequently, neither the general maritime law nor DOHSA properly govern Plaintiff's claims against LMS.

59. The acts and omissions of LMS' officers in New Orleans, Louisiana, in denying timely and adequate medical care to Neville Motts after his injuries on February 15, 1998, proximately caused his ultimate death in Houston, Texas, on March 20, 1998. These acts and omissions

were both actively committed by corporate officers of LMS and subsequently ratified, in direct disregard of an extreme degree of risk to Neville Motts and in conscious indifference to the safety and welfare of Neville Motts.

60. To the extent any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

For reasons set out in the Court's Findings of Fact and Conclusions of Law, hereinabove set out, and pursuant to Rule 58 of the Fed.R.Civ.P., Judgment is hereby rendered in favor of Plaintiff on her stated claims against Defendants. Therefore, Plaintiff, Danna Motts, shall have and recover from Defendants, Central Gulf Lines, Inc.; LMS Shipmanagement, Inc.; and M/V GREEN WAVE, jointly and severally, in the total amount of $ 1,312,-686.00, inclusive of actual damages in the amount of $1,062,686.00, and punitive damages in the amount of $250,000.00, plus taxable costs of court and pre-judgment interest as set forth herein, and post-judgment interest at the rate of 6% per annum, for which execution shall issue if not timely paid.

THIS IS A FINAL JUDGEMENT.